## GOODENOW v. TAPPAN.

Plea in abatement misnomer in plaintiff's baptismal name; replication that the plaintiff is known by one name as well as the other, good.

Words spoken in discharge of official duty not actionable.

If spoken under pretense of official duty, wantonly and with malice, words are actionable; the intention with which spoken to be left to the jury.

Words actionable spoken of an attorney.

THIS cause came before the court upon a motion in arrest of judgment, reserved in Jefferson county, and certified to this court for determination. As two important points were ruled in the previous proceedings, and as the cause is of importance to the two respectable gentlemen who are the parties, and who are now both members of the profession, a brief history of the case is here presented.

The declaration was as follows:

*1st Count.* "For that whereas the said Goodenow is a good citizen, and has always maintained a good character from his youth 61] *to the present time, and for divers years has been an attorney and counselor at law of the several courts of judicature of the State of Ohio; yet the said Tappan, well knowing the premises, but contriving and maliciously intending to injure the said Goodenow in his good name and professional character, and to bring him into public scandal and disgrace, and to destroy his practice as a lawyer, and to harass, oppress, and impoverish him, heretofore, to wit, on the 31st day of December, in the year of our Lord one thousand eight hundred and sixteen, at the county of Jefferson aforesaid, in a certain discourse which he, the said Tappan, then and there had, of and concerning the said Goodenow, and of

and concerning his said profession and standing as an attorney and counselor at law, as aforesaid, in the presence and hearing of divers good and worthy citizens of this state, then and there, in the presence and hearing of those citizens, falsely and maliciously spoke and published of and concerning the said Goodenow, and of and concerning his said profession and standing as an attorney and counselor as aforesaid, these false, scandalous, malicious, and defamatory words following, that is to say: 'He (meaning the said Goodenow) fled his country to escape from justice, and now disguises himself (again meaning the said Goodenow) under a borrowed name; he (again meaning the said Goodenow) is unfit to be trusted.'"

*2d Count.* Same inducement as in the first. Words charged: "He is of infamous character—he broke jail in New England and fled from justice."

*3d Count.* Same inducement as in the first. Words charged: "He is a d——d rascal, and an immoral and base man, and unless ignorance of the law makes a lawyer he is no lawyer—he is an ambidexter and a disgrace to his profession."

*4th Count.* "And whereas, also, the said Goodenow is a good citizen and of upright character, and as such has always conducted himself from his childhood to the present time; and now is, and for divers years has been, an attorney and counselor at law of the courts of judicature in this state; and whereas, also, before the committing of the several grievances by the said Tappan, as hereinafter mentioned, a certain appointment was pending, in the power and disposal of the court of common pleas of the county of Jefferson, to the office of prosecuting attorney of the State of Ohio for said county; and whereas the said Goodenow was proposed and considered of as a candidate for said appointment, nevertheless, the said Tappan, well knowing the premises, but contriving and wickedly and *maliciously intending as aforesaid, hereto- [62 fore, to wit, on the first day of January, in the year of our Lord one thousand eight hundred and seventeen, at the county of Jefferson aforesaid, in a certain other discourse which he, the said Tappan, then and there had and held with divers other good and worthy citizens of this state, of and concerning the said Goodenow, and of and concerning his profession and character as an attorney and counselor at law as aforesaid, and of and concerning the appointment of prosecuting attorney as aforesaid, then and there, to wit, on the

·day and year last aforesaid, falsely and maliciously spoke and published of and concerning the said Goodenow, and of and concerning his said profession and character as an attorney and counselor at law as aforesaid, and of and concerning the appointment aforesaid, and in the presence and hearing of the said last mentioned citizens, these other false, opprobrious, malicious, and defamatory words following, that is to say: "He" (meaning the said Goodenow) "is a man of immoral character. He" (again meaning the said Goodenow) "broke jail in his own country, and fled from justice."

*5th Count.* Same inducement and colloquium as in the fourth. Words charged: "He is destitute of character; he broke jail in New England, and fled to escape the lash of the law, and now wears a borrowed name."

*6th Count.* Same inducement and colloquium as in the fourth count. Words charged: "It won't do to appoint such a man; he is of bad character; a man that broke jail and fled from justice is unfit for any office."

*7th Count.* Without any inducement. Words charged: "He is a runaway—he broke out of jail in New England and fled from justice."

The defendant, by consent of the plaintiff, obtained leave to plead at the same time, both in abatement and in bar, as many several pleas as he might deem necessary for his defense, without the pleas in bar being considered a waiver of the pleas in abate-· ment.

He then pleaded in abatement that said "Goodenow is named and called by the name of Milton Goodenow, and by the name of Milton Goodenow from the time of his baptism hitherto hath always been called and known, without that he now is, or at the time of suing out the said writ was, or ever before had been called or known by the name of John Milton Goodenow," etc., and verified the plea by affidavit as the statute required. He also pleaded the general issue upon which issue was joined.

63] *To the plea in abatement the plaintiff replied that "the said John Milton Goodenow long before, and at the time of suing out the said writ, and of filing his said declaration, was and still is called and known as well by the name of John Milton Goodenow, as by the name of Milton Goodenow," etc. To this replication the defendant demurred.

The question upon the demurrer was argued in Jefferson county, at the October term of the Supreme Court, 1819, before Judges Pease and McLean—when the demurrer was overruled, and the cause continued to be tried upon the issue.

A trial was had at November term, 1822, before Judges Pease and Hitchcock, and a struck jury. The testimony to prove the speaking of the words was as follows:

*Alexander Sutherland, Esq.*—At the F. and M. Bank, in Steubenville, in the winter of 1817, after Mr. Goodenow had been elected a justice of the peace the second time, there was a conversation between Judge Tappan, Thomas Scott, the cashier of the bank, and witness.  Judge T. began *boring* witness for having supported the plaintiff for the office of justice of the peace, he having, as witness understood, opposed said Goodenow's election.  Tappan said, "Where he came from, it required the best men to be elected to office, but here it made no odds."  Witness then observed, "Some time since a *lawyer* could not have been elected;" upon which defendant replied, "As to Goodenow's law knowledge, God knows, that ought to be no objection to him."  Witness further stated, that plaintiff had always been known in his practice as a lawyer by the name of John M.

On his cross-examination, he stated that plaintiff had been elected a justice, and the election set aside on Mr. Wright's remonstrance, on account of the votes not having been opened agreeably to law, and a new election ordered.

*Samuel M'Elroy, Esq., late an associate judge.*—Before the appointment of Mr. Hallock, prosecuting attorney, but whether while the office was vacant, or before it became so, witness could not recollect which, in a conversation with Judge Tappan concerning the appointment of a prosecuting attorney—there being several candidates, and among others the plaintiff was spoken of—he said, that Goodenow had left his own country privately, that he was not a law character, and that his christian name was not John M., but Milton.  This conversation was at defendant's house, and considered by witness as private and confidential, and had not before the present moment been divulged.

*Thomas Turner's deposition.*—That a short time after Judge [64 Moores' return from the legislature in the month of February, he, with Judge Moores and James Moores, Jr., were at Judge Tap-

pan's, James Moores, Jr., having an intention of offering for the clerk's office. Judge Tappan asked Judge Moores who he thought a proper person for state's attorney; Judge Moores observed, he knew of no person but Goodenow. Judge Tappan said, "Goodenow won't do—he is an immoral character—he broke jail for debt or otherwise—ran away and changed his name."

*Col. James Moores, Jr.*—Witness' father, Thomas Turner, and himself were at Judge Tappan's in February, 1817, when the subject of appointing a prosecuting attorney was introduced. Judge Tappan said, "It won't do to appoint Goodenow—he is an immoral character—he broke jail—fled his country, and changed his name."

*James Moores, Sen., Esq., associate judge.*—The 3d or 4th of February, 1817, he was in Steubenville, with his son, and son-in-law Turner; his son, having some intention of applying for the office of clerk of the courts, which was then vacant, asked him to walk down to Judge Tappan's. He went with his son and son-in-law, and after some little conversation, Judge Tappan turned himself full in the face of the witness, and said, "It won't do to appoint Goodenow prosecuting attorney." Witness asked, why? He replied, "He is an immoral character (or an immoral man)—he broke jail and fled his country (or fled from justice)—changed his name, and now wears a fictitious one." On the day before, defendant had been conversing with witness about the appointment of a prosecuting attorney, when defendant spoke in favor of Mr. Hallock—said he was a better draftsman, etc., and stated to witness that Judge Anderson was agreed to Hallock's appointment; to which witness replied, if that was the case his assent was not necessary, for the defendant and the other judges would overrule him. Defendant replied, he wanted no overruling about it. At that time witness was in favor of Goodenow's appointment; but when, on the next day, the judge made the charges before stated, he gave Goodenow up. Witness stated further, that the plaintiff had always been known, in his practice at the bar, by the name of John M. and none other.

On his cross-examination, witness said he had, some time in the fall season of 1816, conversed with the plaintiff about the office of prosecuting attorney, and asked him if he would accept it if it became vacant. He said he would, but not to the prejudice of Mr. Wright, the then incumbent.

Goodenow *v.* Tappan.

*The plea in abatement, and the affidavit attached to it, and [65 the certificate of plaintiff's admission by the Supreme Court to practice as an attorney and counselor at law, were then read.

A number of depositions taken in New England were read, by which it was most clearly established that the plaintiff was baptized by the name of John Milton Goodenow, but had generally transacted business and been known by the name of Milton ·Goodenow only. It also was placed beyond all doubt that he had always sustained a fair character, though he had been unfortunate in trade, and that he left New England publicly, and brought with him to this country most respectable testimonials of the rectitude of his moral principles, of his integrity, intelligence, and ·ability.

On the part of the defendant, John C. Wright, Esq., and William Lowry, Esq., were introduced, with sundry documents, to prove that plaintiff had borne the name of *Milton Goodenow* before and after his coming to Steubenville to reside. The plaintiff's counsel ·conceded, and wished it to be understood, that they did not deny that the plaintiff had generally used the Christian name of *Milton* only, before and after he came to Steubenville, which was in September, 1812, until he was admitted to the bar in August, 1813. Mr. Wright also stated that the plaintiff brought letters of introduction from his brother, and perhaps from others, to him, ·when he came to Steubenville; that he then used the name of *Milton* only ; that he read law with him awhile; and that he gave ·him a certificate of good moral character, by the name of *John Milton Goodenow*, upon which he was admitted to an examination before the Supreme Court. Witness further stated, that when ·plaintiff first came to Steubenville he invited him into his family, ·where he resided for some time, and his conduct was fair and ·honorable.

The case was opened to the jury by Mr. Root, for the plaintiff; but the counsel for the defendant declined arguing the cause to that tribunal. They moved the court to instruct the jury that the plaintiff was not entitled to recover on the words proven, because:

1. The words were not *in themselves actionable.*

2. That if intended to be made so, by reference to the professional character of the plaintiff, they would not support an action, because they related to a time *anterior* to the plaintiff's admission to the bar.

69

3. That, if the words were spoken, as he contended they were, in *confidence*, they were not actionable, *without express malice* were proven: and,

66] *4. That, if spoken by the defendant in discharge of his *official duty* as president judge, he was *protected by the law*, and no action would lie.

This motion was argued by Mr. Wright for the defendant, and Mr. Doddridge for the plaintiff; and when the argument on the motion was closed, Mr. Silliman proposed to conclude the case by an argument for the plaintiff to the jury: but it was objected to by the defendant, and ruled by the court, that the practice had long been settled, that where the counsel for the plaintiff had made an argument to the jury (the testimony being closed), to which the defendant's counsel declined to reply, he is not permitted to address the jury a second time.

The court instructed the jury upon the law governing the action, and—"that words, although not actionable in themselves, may become so when spoken of a man in his professional or official character, if they impute to him dishonesty, want of skill, or any other matter that renders him unfit for the profession or occupation which he fills. That malice is the *gist* of the action, and that malice is implied from the untruth of the charge; but that this implied malice may be done away by circumstances; that it is necessary for public good that judicial officers, as well as others in whom an appointing power is lodged, should be protected in a free and unrestrained communication on the qualifications of candidates before them; but this should be exercised in good faith, and ought not to be used as a cloak to cover malicious or wanton attacks upon those who may offer themselves for public employment. If, in the case submitted, the jury should be of opinion that the words were spoken in the discharge of the defendant's official duty, as presiding judge of the court before whom the plaintiff was a candidate for an office which was in the power of that court to bestow, and that the words were spoken in confidence, and without malice, they would then be stripped of that malice which constitutes the legal character of slanderous words, and the defendant would be entitled to a verdict. But this was a question of fact to be left to the jury to decide; and if they should not find the situation of the parties, and the circumstances under which the words were spoken—the time, manner, and place of speaking—such as to divest

them of their natural malicious import, the defendant would not stand excused."

The jury found the defendant *guilty*, and assessed the plaintiff's damages at *six hundred dollars*.

The defendant filed reasons for a new trial, and also in arrest of *judgment. The reason for a new trial was as follows: [67

The verdict is against the law and evidence in this, that the only evidence upon which the verdict could be rested, is evidence of consultations and conversations held by the defendant to and with Judges M'Elroy and Moores, his associate judges of the court of common pleas of Jefferson county, of and concerning the appointment of a prosecuting attorney for said county, for which office the plaintiff was a candidate, and that by the law of the land no action of slander will lay, or can be sustained upon and for words so spoken in the discharge of an official duty.

In arrest of judgment, it was alleged that the *third, fourth, fifth,* and *sixth* counts in the declaration were not actionable.

The motion for a new trial was argued for the defendant by Hallock and the defendant himself, and by Silliman for the plaintiff.

For the defendant, it was insisted that the nature of malice in reference to slanderous words was to be determined:

*First.* By the nature and character of the words: as where words are actionable in themselves, if false, there malice is absolutely inferred.

*Second.* Where words are not actionable in themselves, but are made so by circumstances, as by proving malice expressly.

*Third.* Where from the occasion of speaking the words, the law does not permit malice to be inferred.

In this case the words belong to the second or third class.

Malice must be proven *aliunde* or expressly in all cases where words are spoken in confidence. Bul. N. P. 8.

No action lies in such cases, unless there should be "extraordinary circumstances of express malice." 4 Bur. 2425; 1 Term Rep. 110. Such as there was in the case of The King *v.* L. Abington, 1 Esp. 226.

If this case be of the second class there is no evidence to support it. No evidence was given of express malice.

No action lies for words written or spoken, however false and scandalous, if such matter were written or spoken in a course of

71

justice, and before those who have power to examine it.   Buckley
v. Wood, 4 Co. 14; Croke Eliz. 230, 248; Lake v. King, 1 Saund.
132, and note 1; Astley v. Young, 2 Bur. 808; Weatherston v.
Hawkins, 1 Term Rep. 110; Barbauld v. Hookham, 5 Esp. N. P.
109; Johnston v. Evans, 3 Esp. 32; Thorn v. Blanchard, 5
Johns. 508.

Case stronger for the defendant than any in the books.

68]   *1. He was in the discharge of an official duty, consulting
with his associates as to the appointment of prosecuting attorney.

2. He spoke the words to none but the associate judges, and to
them only when the appointment was the subject of conversation.

3. He had no reason to suppose that words thus spoken would
be repeated or divulged.

There is nothing in the testimony to warrant the jury in finding
that the words were not spoken in good faith, or to justify them in
saying that the official occasion was used to cover a malicious or
wanton attack upon the plaintiff.   The court placed the defendant's
liability upon this ground, and the verdict is against the fact, if the
court were right.   But it is insisted that, upon the authorities
quoted, it is clear that for words spoken in the performance of offi-
cial duty, no action can be sustained, even if the words are both
false and malicious; for the question of malice can not be examined.
It can not be inferred, neither can it be proved.

Mr. SILLIMAN, for the plaintiff, maintained:

That the testimony supported the verdict in finding the fact of
malice.   He insisted also that the just inference from the whole
testimony was, that the words were not spoken in confidence
to the associate judges, because spoken to one of the judges in
the hearing of others.   The testimony of Sutherland also proved
malice.   He maintained that the law was stated correctly in the
instruction of the court, and that the verdict of the jury conformed
to it.

No argument was had on the motion in arrest, and both motions
were held under advisement.   At the sitting of the Supreme Court
in Franklin county, December term, 1822, the motion for a new
trial was overruled, and the motion in arrest certified back to Jef-
ferson, that the defendant might have an opportunity to argue it.

At September term, 1823, at Jefferson county, the defendant ob-
72

tained leave to amend his motion in arrest, and then extended his exceptions to all the counts in the declaration. The determination of this motion was reserved for decision by all the judges.

HAMMOND, in support of the motion:

The declaration in this case contains seven counts, upon which entire damages have been assessed by the jury. If any one of the counts be bad, the judgment must be arrested. 3 Wilson, 185; Douglas, 722; 6 Term Rep. 691; 8 Johns. 119.

The inducement to the three first counts sets out, that the plaintiff *is an attorney and counselor at law of the several courts [69 of this state; that in a conversation of and concerning the plaintiff and of and concerning his profession and standing as an attorney and counselor, the defendant falsely and maliciously spoke and published of and concerning the plaintiff, and of and concerning his profession and standing as an attorney and counselor, the following words:

" He fled his country to escape from justice, and disguises himself under a borrowed name. He is unfit to be trusted.

" He is of infamous character. He broke jail in New England, and fled from justice.

" He is a damned rascal and an immoral and base man; and unless ignorance of law makes a lawyer, he is no lawyer. He is an ambidexter and a disgrace to his profession."

The inducement to the fourth, fifth, and sixth counts charges that the office of prosecuting attorney was about to be filled, and that the plaintiff was a candidate, and alleges the words to have been spoken of and concerning the plaintiff and his profession and character as an attorney and counselor, and of and concerning the appointment of prosecuting attorney. The words are:

" He is a man of immoral character. He broke jail in his own country, and fled from justice.

" He is destitute of character. He broke jail in New England, and fled to escape the lash of the law, and now wears a borrowed name.

" It won't do to appoint such a man. He is of bad character. A man that broke jail and fled from justice, is unfit for any office."

The inducement to the seventh count says nothing of the profession of the plaintiff, and the words are alleged to be spoken of him without any reference to a special character or profession.

They are these : " He is a runaway. He broke out of the jail in. New England, and fled from justice."

The words charged in the third count are unquestionably ac- tionable. But I maintain that, upon established principles, no action can be sustained upon either of the sets of words in the other counts.

The general rule, as to what words are actionable, is very dis- tinctly laid down by Lord Chief Justice De Grey, in Anslow v. Horne, 3 Wils. 186 :

" The first rule is, that the words must contain an express impu- tation of some crime liable to punishment. Some capital offense, or other infamous crime or misdemeanor, and the charge upon the person spoken of, must be precise."

70] *" The second general rule is, that words are actionable when spoken of one in an office of profit, which may probably occasion the loss of his office ; or when spoken of persons *touching their re- spective professions, trades, and business*, and do or may probably tend to their damage."

Courts universally agree in recognizing the validity and correct- ness of these rules. Of the first, in McClurg v. Ross, 5 Binney, 219, Chief Justice Tilghman says : " I will not say that the cases to be found on this point are in perfect unison. But from a full consid- eration of them, I think myself warranted in laying it down, that (with certain exceptions as to persons in office, special damage, etc.) words are not actionable unless they contain a plain imputa- tion of some crime liable to punishment. Such was my opinion in the case of Shaeffer v. Kintzer, 1 Binney, 542, and I have found no reason for altering it."

The Court of Appeals of Kentucky, 2 Bibb, 473, after examin- ing the cases in the English books, say : " The rule, therefore, evi- dently deducible from the whole of the adjudged cases, is, that words to be actionable must charge an offense subject to corporeal or other infamous punishment." The same doctrine is held in the same book, page 319, and in Hardin, 529.

None of the words charged in the declaration are actionable within this rule. Indeed, the declaration is not predicated upon the principle that the tendency of the words is to subject the plaintiff to punishment. It proceeds altogether upon the rule, that the words are actionable, because spoken " touching his profes-

sion," and tend "*to destroy his practice as a lawyer, and to harass,, oppress, and impoverish him.*"

Words to be actionable within the second rule, must be spoken "*touching the profession.*" Though the tendency of the words may be to injure a man in his professional pursuits, they are not actionable unless spoken in reference to, or, in the words of Chief Justice De Grey, *touching that profession.*

In Hutton *v.* Beech, Cro. Jas. 339, it was alleged that the plaintiff was constable and church-warden, and by reason of those offices, expended divers sums of money for the use of the inhabitants. The defendant said of him : " Thou hast beguiled and deceived the town, upon thy accounts, of four pounds, and it is no marvel thou growest rich, when thou deceivest the town." Adjudged not actionable, because the action was not in point of office.

Brunkard's case, Cro. Jas. 427, charged that the plaintiff was *one of the privy chamber of the king ; and defendant said : [71 " Thou art a cozening knave and livest by cozening." Held not actionable.

In Willis *v.* Shephard, Cro. Jas. 619, plaintiff alleged that he was steward of Lord Arundle's courts in the county of Dorset; that he was parishioner of Gillingham, and church-warden there,, and had received one hundred pounds by virtue of his office, and made a just account; that he was collector of the poor, and received money as such, and made a just account ; that he was feoffee of lands for the parish, and received and accounted for money ; that.. he was steward of the king of the manor of Gillingham, and received and accounted for money. And defendant, speaking of him and of his offices, said : " Charles Willis is a notorious liar and a cozener,. and hath deceived and cozened the parishioners of Gillingham of five hundred pounds, and he will teach thee to cozen me of my house." And because they " were not such words whereof the law takes cognizance nor to his loss of life or goods, or otherwise to *touch him in his profession,*" these words were adjudged not actionable, after an inquiry of damages upon *nil dicet.*

In Tod *v.* Hastings, 2 Saund. 307, the plaintiff alleged that he was a draper, and got his living by buying and selling clothes and other merchandise ; and defendant said of him, " You are a cheating fellow, and keep a false book, and I will prove it." It was objected in arrest of judgment, that it was not averred in the declaration that the words were spoken in relation to the plaintiff's buying

,and selling, and therefore *did not touch him in his trade;* and the whole court were of that opinion and arrested the judgment.

The note upon this case asserts that the declaration must aver that the words were spoken of the particular profession, and that at the trial the plaintiff must prove "that the words were spoken of him in relation to his profession, office, or trade, according to such allegation, otherwise he will fail in his action and be nonsuited." Sir T. Ray. 75; 6 Mod. 202; 2 Salk. 696, are cited. Many other authorities are referred to in Salkeld. I will only add Ld. Ray. 1417.

· The authority of these cases has been recognized by the Court of Appeals of Kentucky. Mills *v.* Taylor, 3 Bibb, 469. The words charged to have been spoken in this case are as follows: "You are a damned rogue and a swindler; you say you were authorized by Price and M'Cutchin, of Philadelphia, to draw bills on them, and if you have any letters from them, you forged them. I can prove you are a damned rogue and a swindler. I can prove you never had a letter from Price and M'Cutchin, to authorize you 72] *to draw bills on them. You are a damned refugee from Canada, and you came from Canada to swindle the people of Kentucky out of their property." Of these words the court say: "They are not charged in the declaration to have been spoken of the plaintiff in relation to his trade; and it is a settled rule, where words are not actionable in themselves, but are so only because they are spoken of a person in his profession, office, or trade, they must be alleged in the declaration to have been spoken of him in relation to such, his profession, office, or trade, otherwise the declaration will contain no cause of action."

All these authorities are full and conclusive to the point, that the last count in the declaration is defective. It contains no suggestion that the words were spoken in relation to the plaintiff in his profession; that profession is not even named in the colloquium. This lays a sufficient ground for arresting the judgment. But I maintain further, that the principle fairly deducible from these authorities, when applied to the case before us, demonstrates that no action can be sustained upon any other than the third count.

It is clear that the words in the first, second, fourth, fifth, and sixth counts are not actionable in themselves. And it is also clear, that although charged to be spoken of the plaintiff, and of his profession and standing as an attorney and counselor, he can have no

action against the speaker, unless they relate to or touch his profes-
sion.

In Foot v. Brown, 8 Johns. 64, the suit was brought for saying of
the plaintiff, an attorney, "Foot knows nothing about the suit, and
he will lead you on until he has undone you." After verdict for
the plaintiff, and upon a motion in arrest, the counsel for the de-
fendant asserted that "the cases in which it has been held that an
action lies for words reflecting disgrace on a man in his trade or
profession, may be divided into three classes: 1. Where the words
charge the person with a want of fidelity or integrity in his trade
or profession generally, as to say of a lawyer, he is a common bar-
rator. 2. Where the words charge a person with dishonesty, cor-
ruption, or want of integrity, in a particular case. 3. Where the
words impute ignorance or want of skill in general terms." The
court recognized the correctness of these positions and arrested the
judgment, and I think the soundness of the opinion can not be suc-
cessfully controverted.

All the cases agree that the words spoken must relate to or touch
the profession. It is not enough that the profession be the subject
*of conversation, nor that the words reflect upon the general [73
character of the party. Their tendency must be to affect directly
professional skill or professional integrity, otherwise they are not
actionable.

This action is not given to professional men and to tradesmen
for the purpose of extending to them and to their characters a
higher protection than is secured to other citizens; but for the
purpose of affording equal security to all. He who follows a pro-
fession or trade for a living, may be assailed by defamation in that
profession or trade. He is, therefore, exposed to an attack to
which men engaged in no particular pursuit are not vulnerable.
When he is thus attacked, this action is given as a means of re-
dress. But he can no more sue it for terms of general obloquy
and reproach applied to him as a citizen, than if he did not follow
a profession or trade.

The words, to be actionable upon this ground, must have an ap-
propriate application to the profession or trade of the party of
whom they are spoken. The same set of words spoken of a law-
yer, a physician, or a merchant can not give an action to each;
for they can not touch the profession of all, however they may
alike affect their general reputation as men. To say of a physi-

·cian, that he is a bankrupt, a cheat, a swindler, and a fomenter of strife and litigation, would not be actionable, because none of these things touch his skill or conduct as a physician. Yet for the three first a merchant could have an action; and if spoken of a lawyer, all but the first would be actionable.

Habitual intoxication progressively disqualifies a man for the pursuit of any profession or trade. Yet to say of a lawyer, physician, or merchant, that he is a drunkard, is not actionable. Were it a fact, it does not directly touch his integrity or skill in his business. But to say of a clergyman that he is a drunkard, is actionable; because if it be true, the congregation or other authority by which he was constituted, would, for that offense, degrade him from his office.

In the case of Dr. Blodget, tried at the Supreme Court in Dayton, June, 1823, before Judges Pease and Burnet, the declaration charged the words to have been spoken of the plaintiff in his professional character; and the words set out imputed to the plaintiff such a habit of intoxication, that, in consequence of it, his business as a physician was declining. Upon the principles here stated, the court charged the jury that the words were not actionable, and there was a verdict for the defendant.

This decision is in strict conformity with the cases I have cited, 74] *and with the cases generally as found in the books. There is, in Comyn's Digest, title Action upon the Case for Defamation, an extensive collection of words upon which the different descriptions of actions can be sustained. Those which relate to a counselor are collected under D. 22 and D. 24. With a single exception, they relate directly to the profession. One case is cited from 1 Roll. 55, in which the words "he hath the falling sickness" were held actionable. The reason given is, "for that disables him in his profession." It is evident that this case can not be law. The imputation for which the action is given, must be of something reprehensible in the individual conduct and demeanor of the party. To attribute to him a disease proceeding from no act of his own, and attaching to him nothing immoral or discreditable, and operating only partially to affect his capacity, can not be actionable. If actionable of an attorney, the same imputation cast upon every man of business must be actionable, and must extend to various other diseases besides that named. The charge of drunkenness presents a much stronger case.

Goodenow *v.* Tappan.

I assume, then, the rule to be, that words to be actionable, because spoken of an attorney and counselor at law, must be spoken of his professional character and conduct, and must be of such description as directly to touch that professional character and conduct. If the words themselves be .not of this description and character, no finding of a jury or explanation by innuendo can make them actionable. I will proceed to examine the different sets of words contained in the declaration, by the application of this rule.

" He fled his country to escape from justice, and disguises himself under a borrowed name. He is unfit to be trusted."

These words touch not the skill or information of the party. If they be actionable, it is because they reflect generally upon his professional conduct; and it is most evident that they can not, and do not, relate to any act that was or could be done by the plaintiff in his profession as an attorney or counselor. The misconduct imputed to the plaintiff is not an abuse or neglect of any professional trust or employment, but the doing of an act inconsistent with his duty as a good citizen, and which is just as reprehensible in any other citizen as in an attorney. The act charged to have been done, is not one which his profession put it in his power to commit, or with which his profession could have any possible connection. Any man, with or without trade or profession, could do the same act. It would be as discreditable in a tailor as in an attorney. *The imputation, if false, would injure all men [75 seeking employment from others alike. The day laborer, in proportion to his wants and his wages, would feel it as sensibly as a counselor at law; and if one man can have an action for these words, every man ought to have it. The justice of this argument is strongly enforced by the very facts of this case. It is notorious that the plaintiff was not admitted an attorney and counselor at the time the words charge him with committing the facts. How can words touch his professional character and conduct, which speak of facts done before that character commenced?

Possibly the last clause in this count, " He is unfit to be trusted," might be held actionable in itself. It is not necessary to examine this point, because there is nothing of this kind in the second count.

" He is of infamous character. He broke jail in New England and fled from justice."

The first clause in this set of words does not import that the plaintiff was of infamous character in his profession. It is a general charge against him as a man, that his character was infamous. Now the general character of a man may be infamous, and yet he may discharge professional duties with integrity and ability. The fact that a lawyer pays little regard to principles of right and wrong, does not affect his practice and business, if he be looked upon as a man that will not betray his professional trusts. If it were said that his conduct as an attorney was infamous, or that his professional character was infamous, the words would touch his profession, and might affect his practice. But a general allegation of infamous character stands upon different ground. There is no more reason why a lawyer should have an action for these words, spoken of him generally, than that every citizen should have an action for the same words.

It may be thought that the distinction I take is too refined and unsubstantial: and it may be said that if a man be of infamous character, that infamy must attach to him in everything he is concerned with. A proper attention to the cases decided, and to the principles upon which the decisions stand, will show that I am right. It were idle waste of time and labor to require in the declaration an allegation that the words were spoken in reference to the profession, and to require proof that the words were so spoken, upon the trial, if the action could be sustained upon words of opprobrium spoken in reference to the general character of the man only—words which, in their natural interpretation, refer to 76] general individual *conduct, and not to professional acts. A man may be an open profligate with regard to women, and may spend his nights in stews and brothels—he may be a contemner of all religion, a profane swearer, and open violator of the Sabbath. In all these particulars he may be deemed of infamous character, yet in the profession either of law or medicine, he may be in the highest degree intelligent, diligent, and upright. If an action may be sustained by a lawyer, for saying of him that he is of infamous character, every tradesman, merchant, and person in office must have an action for the same words. Thus the rule of law, that the words must touch a man in his peculiar profession, is subverted, and a new principle is introduced, by which terms of general reproach are made actionable, in all cases, when spoken of professional men, tradesmen, and officers. It will, then, no longer be

80

necessary to allege or prove that words were spoken of the particular business of the party. It will be enough to set out that the plaintiff followed a profession or trade, and that the words were spoken of him generally. The decisions upon this point, as I have shown, are uniform, and it seems clear that they proceed upon the position that an action can not be maintained unless the words, in their plain and natural import, apply to, touch, and affect the plaintiff's professional conduct and character.

The words in the fourth, fifth, and sixth counts are less strong than those upon which I have been commenting, and can not be actionable unless made so in consequence of being spoken of a candidate for office.

The plaintiff alleges that he was a candidate for the office of prosecuting attorney, and that defendant, in reference both to his profession and to the appointment, said : "He is a man of immoral character. He broke jail in his own country and fled from justice. He is destitute of character. He broke jail in New England and fled to escape the lash of the law, and now wears a borrowed name.. It won't do to appoint such a man. He is of bad character. A man that broke jail and fled from justice, is unfit for any office.

Not one of these sets of words naturally import that they were spoken of the plaintiff's professional character. They contain no imputation that the plaintiff was ignorant of his profession, or unfaithful in professional conduct. His profession or professional character is not named. The words are spoken of him generally as a man, not particularly as an attorney and counselor at law. It won't do to appoint him. Not, however, because he is not a lawyer, or because confidence can not be reposed in his professional integrity, *but because he is a man of bad character, that [77 broke jail and fled from justice. This, if true, could not touch him in his profession, otherwise than indirectly, as any other charge of immorality or bad conduct might affect him, and is therefore no foundation for an action.

I do not see that the plaintiff's case is strengthened or varied by the fact that he was a candidate for the office of prosecutor. Words not actionable in themselves, do not become so when spoken of a candidate for office, unless they have the effect of preventing him from obtaining the office. Nothing of this kind is alleged. The fact that he was a candidate might be material to show the

circumstances under which the words were spoken, but it can have no bearing upon the character of the words themselves. They must be actionable independent of that fact, or they are not actionable at all.

The PLAINTIFF himself submitted an argument in support of the action and against the motion in arrest. He suggested, first, that the seventh count was actually abandoned at the trial; and upon that point presented an affidavit, and the following remarks:

The plaintiff, in the first place, submits to the court, whether their honors, Judges Pease and Hitchcock, who tried the cause, or even the court in bank, can not amend the record so far as to direct the seventh count to be *stricken out.* Indeed, it is a question whether the *abandonment* of a count has any place in the record. The count is withdrawn and the record stands as if no such count had ever belonged to the declaration; surely, then, no record of the abandonment need be made. Suppose, also, the clerk had neglected to enter the verdict, or had entered it wrong, could not the court, being acquainted by their own observation of the fact, correct the mistake of the clerk? The court are not sitting in *bank* as an *appellate court;* the *record* of every cause—for they have none but their own causes—is as much under their inspection and control now as it was at the proper county. Whether the seventh count was abandoned or not, is not a fact to be *litigated.* What object is there to be effected or arrived at by sending the cause to Jefferson county to correct that which the court know to be true, and which could not there be controverted. Mr. Leavitt's affidavit can not be disputed by negative testimony, even if the court should not distinctly recollect the abandonment.

I think I am entitled to some consideration on this point; the cause has been years in court, and was never continued, either before or since the trial, at my instance, but always against my wishes. It was taken under advisement in 1822 on motion for new trial and in arrest—the motion for a new trial was overruled at Columbus last year, and the motion in arrest continued to the last term in Jefferson county. At that term the defendant had leave to amend his motion by inserting all the counts, having only made his motion apply originally to the third, fourth, fifth, and sixth counts, not including the most deficient one, as he now contends, because he well knew it had been abandoned. I knew not

but the *abandonment* was entered in the journals, or the more correct course pursued by the withdrawal of the seventh count, until I saw the defendant's argument a few days before I left home for Columbus, in November last. I would by no means be considered in these remarks as complaining of the court, but merely showing why I think this cause ought to be no further delayed to my injury.

If the court make a final decision of the cause at this time, should that decision render the question a legitimate one, I would ask the court to consider, whether the struck jury was not requisite in the cause, and that they would make an order on the subject of *their charges* as allowed by the statute relating to juries.

Upon the merits the plaintiff presented the following:

In the absence of my counsel, who was expected to attend at Columbus during the court's sitting in bank, I can not even attempt an argument, not having bestowed any attention whatever on the questions arising under the motion in arrest, and having at the present scarcely a moment's time to spare from public duties. I will, however, suggest a few considerations to the court which presented themselves to my mind on reading the argument of the defendant's counsel.

In the first place, the decisions or *dicta* of courts, in actions for words touching one's *official* character, ought to be laid aside— they can have no connection with the doctrines that govern the action in the shape it assumes in this cause.

" The second general rule," as quoted by the defendant's counsel from 3 Wilson, 186 (to which authority as well as to all others by him cited, I can not now refer), is unquestionably agreeable to the current of authorities; " that words are actionable when spoken of one in an office of profit, which may probably occasion the loss of his office, or when spoken of persons touching their respective professions, trades, and business, and do or *may probably tend* to their damage." On this principle it seems no difference of opinion could *exist between any two gentlemen of the profession, as to [79 its application to the words contained in the six first counts of the declaration. The declaration alleges that the words were spoken by defendant " *of and concerniag the profession* and character of the plaintiff as an attorney and counselor at law." The jury have found this allegation to be true. But the counsel for

83

the defendant answers, that although these words were spoken *of* *and concerning* the plaintiff as an attorney and counselor, yet they "are not such words as naturally import that they were spoken of his professional character;" or, in other language, they are not in themselves such words as the court will construe to be actionable when spoken of the profession of the law. So that were A. B. to say to E. D., who is a practicing lawyer, "You, sir, as a lawyer, broke jail, and fled from justice, and now wear a borrowed name," he would not be liable in an action for words, because "the misconduct imputed to the plaintiff is not an abuse or neglect of any professional trust or employment, but the doing of an act inconsistent with his duty as a good citizen, and which is just as reprehensible in any other citizen as an attorney. The act charged to have been done is not one which *his profession put it in his power to commit,* or with which his profession could have any possible connection." The jury say the words were spoken of, and concerning the plaintiff's profession and character as an attorney. But the court are called upon to say *it's not true;* because the words themselves do not technically convey an idea of an act *professionally done.* The result of this doctrine is this, that a man having been admitted to the practice in this state, may be charged with all the crimes and offenses known to our law, or to our system of ethics, and if the charge does not in itself convey the idea that the act done, or the defection of principle, necessarily or entirely rose out of, or attaches to his professional conduct, no action lies. A member of the profession is like a *scissors-grinder* or *bellows-mender;* if he can sharpen a knife, or make the bellows blow a good blast, it is all that is requisite to gain business, and make a profit in his profession: an argument might not ever be better suited to a client and his cause; nevertheless I do not believe it to be the law of the land.

In truth the argument of defendant's counsel is wholly dependent upon this doctrine, that the profession of the law is the mere business of the *head, the tongue, and the pen;* that the *heart,* the soul, and the good feelings of human nature have nothing to do with it. That he may be a beast, a brute, a scoundrel, a liar, a profane swearer— all these and even more, and yet be an *"upright"* lawyer. If such 80] *ideas are entertained by any enlightened gentleman in this country, I desire he may not be discovered among my friends. Our statute law admits no man to an examination for admission to prac-

tice law, unless he produces a certificate of his *good moral character;"* and yet the counsel says *moral* character has nothing to do with a *lawyer's* character. Such an idea may flow from the crudities of the common law, but not from common sense.

In the case in 8 Johns. 64, the doctrine which the counsel relies upon, is in brief this : that a charge of want of fidelity, want of honesty, or want of skill in the profession is actionable, agreed. And will not this support the verdict of the jury in the present cause? So, also, the case cited from Bibb; the language used by defendant in that case was less strong than that used in this. Yet it seems the court would have had no doubt of sustaining the verdict in that case, if the words had been charged as spoken *of plaintiff in his profession.*

It is said that these words, in the second count, " he is of infamous character," do not import that the plaintiff was of infamous character *in his profession.* The declaration states that these words were spoken of the plaintiff, and *of and concerning his profession and standing as an attorney and counselor at law."* I know not how to understand the counsel; would he have the pleader say, that " the defendant spoke and published these words *of and concerning the profession* of the plaintiff—that he was of infamous *professional* character ?" Such is the doctrine he advances, because as the words "infamous character " do not *import* in themselves that a man is *professionally* infamous, they can not be spoken " of and concerning a man's profession " so as to be actionable, unless the speaker conjoins to the word *infamous* the word designating his profession ; so that the most bitter tongue of slander could play until it had no further power or motion, and not only endamage, but destroy a fair professional reputation, without subjecting its possessor to an action of slander.

A reflection is here excited which often involuntarily and almost imperceptibly arrests the career of the mind when pursuing a course of technical reasoning. How wide is the difference between a legitimate argument upon *truth and fact,* and an argument built upon deductions *techanically* drawn from such truth and fact. The one is the production of logic, to the other I give no name. In the declaration under examination, it is alleged that the plaintiff was an attorney and counselor at law—that the defendant, contriving and maliciously intending to injure the plaintiff in his good name and *professional* character, spoke and published of and concerning the

85

Goodenow v. Tappan.

81] *said plaintiff, and *of and concerning his said profession and standing as an attorney and counselor at law,* " he is of infamous character." In what, and as to what? In his character as an attorney and counselor, and as to his profession and standing as such attorney and counselor. This is the response which the jury have given, and it is therefore beyond contradiction. Can sound logic, common sense, or right reason, give any other construction to this allegation of the declaration and the finding of the jury, than that the slander was *"touching* the plaintiff's professional character?"

But another important consideration deserves the attention of the court. An attorney in this country depends very much for his professional emoluments on the reputation which he bears, not only as to moral character, but as to his *safe pecuniary standing.* And whatever technical disguise may envelope the real motive and truth of the matter, it is known to all men of observation, whether learned in the law, divinity, or physic, or not learned at all, that the reputation of not being punctual in paying over money—of not being morally honest—of not being of fair unimpeachable standing in the community—will either of them sink an attorney's business, and perhaps make him a beggar.

It is true the inducement in the fourth, fifth, and sixth counts, relative to the plaintiff's being a candidate for the appointment of prosecuting attorney, was not inserted on account of the failure of the plaintiff to obtain that appointment. He never *sought* that appointment, and felt not even a regret that another more worthy was preferred. But he would have evinced an apathy of feeling belonging only to him who has a character with which "suspicion" *does* " affiliate," had he permitted the foul defamation to rob him of his professional reputation, and to make him " poor indeed," without an attempt to repel. This inducement was inserted to show more directly that the slander *touched his profession.* The appointment was of a professional nature, and if the doctrine be correct that a lawyer may be " intelligent, diligent, and *upright in the highest degree in his profession,*" and yet " be deemed of infamous character," where was the object of the learned judge, the defendant, in using the language he did, at the time he did; and what means the finding of the jury! Here are absurdities and contradictions opposed by the truth of the case and the common sense of mankind, as well

as sound legal principles, too glaring to cause the mind even to hesitate.

But I submit to the court whether the declaration, stripped of all the inducement and colloquium, does not contain actionable words *sufficient to support the declaration, even in the *last count*, [82 which was abandoned.

The words charged in the most exceptionable counts are, "he broke jail and fled from justice."

The breaking of jail in itself is a crime in almost all countries in christendom; and although the crime is charged as having been committed in a foreign country, the words are still actionable.

But the being a "fugitive from justice," subjects every man to arrest by the law of the United States, and on the governor's warrant he may at any time be apprehended and conveyed in chains to the jurisdiction from whence he escaped. I should like to be informed if there be an authority in all the reports in England from the Year-Books down to Maule and Selwyn; or in this country from the earliest decision to be found in Dallas, down to the latest in Johnson, that will protect the slanderer in charging an innocent man with being a "fugitive from justice!"

From some *law memoranda* I have in my pocket-book, I make the following references.

What is the use of a *colloquium?* It is to point such words to the plaintiff or his profession as do not of themselves naturally and necessarily apply to the plaintiff or his profession. C. Gidney v. Blake, 11 Johns. 54; Cave v. Shelor, 2 Mun. 193; Lindsey v. Smith, 7 Johns. 359; and in the case of Foot v. Brown, 8 Johns. 64, cited by defendant's counsel, I have a note which says, the law gives an action for words that affects a man's *credit* in his profession. Breach of prison, see 4 Bl. Com. 130, on words being actionable which charge a crime committed in a foreign jurisdiction, or where the statute of limitations bars a prosecution, see Van Ankin v. Westfall, 14 Johns. 234.

The court were unanimously of opinion that the seventh count was bad. Judges Pease and Hitchcock were of opinion that all the other six counts were good. Judges Burnet and Sherman were of a different opinion as to some of the counts. The court, therefore, being equally divided on the motion in arrest, it failed;

and the cause was certified back to Jefferson county, that examina-
tion might be had as to the abandonment of the seventh count.   If
the fact of abandonment is made out, judgment to be entered for
the plaintiff on the verdict—otherwise, judgment arrested.†